IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**ERIC D. JONES**                                                                                          **PLAINTIFF**

**v.**                                                                            **No. 4:19CV136-DAS**

**DR. TONY CASTILLO**                                                           **DEFENDANTS**

**MEMORANDUM OPINION**

This matter comes before the court on the *pro se* prisoner complaint of Eric D. Jones, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plaintiff alleges that the sole remaining defendant, Warden Timothy Morris: (1) failed to address the issue of denial of adequate medical care, and (2) and retaliated against the plaintiff for seeking redress for his grievances about medical care. The defendant has moved [34] for summary judgment; the plaintiff has not responded to the motion, and the deadline to do so has expired. For the reasons set forth below, the defendant's motion [34] for summary judgment will be granted, and judgment will be entered in favor of the defendant.

**Summary Judgment Standard**

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998). Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992).

The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of

proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

## Undisputed Material Facts[1]

At the time of filing his complaint, Eric Jones was an inmate in the custody of the Mississippi Department of Corrections ("MDOC") and has filed suit under 42 U.S.C. § 1983 for alleged violations of his constitutional rights. *Compl.*, [1] at 2. At all times relevant to his suit, he was incarcerated at the Mississippi State Penitentiary ("Parchman") located in Sunflower County, Mississippi. *Id*. Mr. Jones alleges violation of his Eighth Amendment right to protection from cruel and unusual punishment by deliberate indifference to a serious risk to his health.

According to the allegations in the complaint, Mr. Jones was moved to Unit 29-A building in September of 2017. Mr. Jones alleges that, since then, he has experienced deteriorating health, including approximately 30 pounds of weight loss, cold sweats, mucus build-up in his lungs, muscle aches, and flu-like symptoms. *Id*. at 8. Mr. Jones claims these ailments are symptoms of an as-yet-undiagnosed serious illness. *Id.* His allegations present three primary areas in which MDOC has failed to provide him with necessary medical treatment. First, Mr. Jones claims to have experienced extreme weight loss, the cause of which has not been diagnosed. Doc. [1] at 6. Second, he alleges that he suffers from asthma, as well as mucus in the lungs, and has been denied his asthma pump and removed from chronic care or provided other necessary medical care for these conditions. *Id*. Mr. Jones also suspects that the cause of his ailment is a sexually transmitted disease ("STD") and alleges he has not received STD testing he requested. *Id.* at 11.

---

[1] The court has taken some of the plaintiff's allegations and, for the purposes of this memorandum opinion only, assumed them to be true. The defendants have not conceded the accuracy of the allegations.

Mr. Jones claims that two prison medical personnel, Nurse Steward and Dr. Castillo, have repeatedly referred him to appointments with a physician at the Unit-42 hospital, but prison officials have never taken him to the appointment. *Id*. at 9. He also alleges that in July of 2019, defendant Morris moved him to a cell with no lights, electricity, sink, or water in retaliation for pursuing this lawsuit. *Id.* at 11. Mr. Jones requests a complete physical exam and bloodwork to be performed outside of MDOC's influence (to diagnose the cause of his malady), monetary compensation, and transfer to a different facility. *Id*. at 7. Defendant Timothy Morris was the Area-I Warden at the time, and Mr. Jones seeks to hold him liable in his supervisory capacity.

Eric Jones filed a grievance, ARP MS-18-1494, on September 19th, 2018, claiming that transportation officers are refusing to pick him up for medical appointments; he also complained of ongoing issues with cold sweats, vomiting, and a knot on his stomach. Exh. "A" at 000029.[2] Mr. Jones appealed this grievance through the second step. *Id*. at 000033. He filed another grievance, ARP, MSP-18-164, concerning his asthma treatment, which he later canceled. *Id.* at 000017. Neither grievance contains allegations of retaliation or the conditions of his cell.

**Failure to Exhaust Administrative Remedies**

Mr. Jones has not exhausted the grievance process as to his claims of retaliation and general conditions of confinement. The documents the parties have provided reveal that the plaintiff did not exhaust the prison grievance process before filing the instant suit. Congress enacted the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq.* – including its requirement that inmates exhaust their administrative remedies prior to filing suit – in an effort to

---

[2] The exhibits referenced in this memorandum opinion may be found attached to the defendant's motion [34] for summary judgment.

address the large number of prisoner complaints filed in federal courts. *See Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress meant for the exhaustion requirement to be an effective tool to help weed out the frivolous claims from the colorable ones:

> Prisoner litigation continues to 'account for an outsized share of filings' in federal district courts. *Woodford v. Ngo*, 548 U.S. 81, 94, n. 4, 126 S.Ct. 2378 (2006) (slip op., at 12, n.4). In 2005, nearly 10 percent of all civil cases filed in federal courts nationwide were prisoner complaints challenging prison conditions or claiming civil rights violations. Most of these cases have no merit; many are frivolous. Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law. The challenge lies in ensuring that the flood of non-meritorious claims does not submerge and effectively preclude consideration of the allegations with merit. *See Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).
>
> Congress addressed that challenge in the PLRA. What this country needs, Congress decided, is fewer and better prisoner suits. *See Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (PLRA intended to "reduce the quantity and improve the quality of prisoner suits"). To that end, Congress enacted a variety of reforms designed to filter out the bad claims and facilitate consideration of the good. Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit.

*Jones v. Bock*, 549 U.S. 199, 203 (2007).

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. §1983. The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S.81, 89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); see also *Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008)( the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement)(*citing Days v. Johnson*, 322 F.3d 863, 866 (5th

Cir. 2003)); *Lane v. Harris Cty.Med.Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11,2008)( under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir.2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. The Supreme Court has also recognized the need for a prisoner to face a significant consequence for deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Woodford* at 95.

Mississippi Code Annotated § 47-5-801 grants the Mississippi Department of Corrections the authority to adopt an administrative review procedure at each of its correctional facilities. Under this statutory authority, the Mississippi Department of Corrections has set up an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a

grievance relating to any aspect of his incarceration. This court approved the ARP Program in *Gates v. Collier*, GC 71-6-S-D (N.D. Miss. Feb. 15, 1994). *See also Marshall v. Price*, 239 F.3d 365, 2000 WL 1741549, at *1 (5th Cir. Nov. 6, 2000). On September 19, 2010, the ARP process was changed from three steps to two. *See Gates v. Barbour*, No. 4:71CV6-JAD, Doc. 1242 (N.D. Miss. Aug. 19, 2010); *Threadgill v. Moore*, No. 3:10CV378-TSL-MTP, 2011 WL 4388832, at *3 n.6 (S.D. Miss. July 25, 2011).

The two-step ARP process begins when an inmate first submits his grievance in writing to the prison's Legal Claims Adjudicator within thirty days of the incident. *Howard v. Epps*, No. 5:12CV61-KS-MTP, 2013 WL 2367880, at *2 (S.D. Miss. May 29, 2013). The Adjudicator initially screens the grievance and determines whether or not to accept it into the ARP process. *Id*. The screening phase operates as a filter – applied before the formal grievance process begins – to remove procedurally defective or otherwise invalid grievances. As set forth above, a prisoner cannot satisfy the exhaustion requirement by filing a procedurally defective grievance or appeal. *Woodford, supra*. Hence, rejection of a grievance during the screening phase terminates the grievance – and does *not* count as exhaustion of the grievance process. *See Seales v. Shaw*, No. 5:15-CV-59-KS-MTP, 2016 WL 616749, at *3 (S.D. Miss. Jan. 26, 2016), *report and recommendation adopted sub nom. Seales v. Wilkinson Cty. Corr. Facility*, No. 5:15-CV59-KS-MTP, 2016 WL 616385 (S.D. Miss. Feb. 16, 2016) (finding rejection during initial MDOC screening process not to constitute exhaustion); *Goldmon v. Epps*, No. 4:14-CV-0112-SA-SAA, 2015 WL 5022087, at *3 (N.D. Miss. Aug. 24, 2015) (same); *see also Robinson v. Wheeler*, 338 Fed. Appx. 437 (5th Cir. 2009) (per curiam) (not reported) (upholding Louisiana initial screening provision of prison grievance process). However, if the defects in the original grievance were minor ("technical" or "matters of form") an inmate may submit a corrected grievance within five days of the rejection:

> If a request is rejected for technical reasons or matters of form, the inmate shall have five days from the date of rejection to file his/her corrected grievance.

*See* https://www.mdoc.ms.gov/Inmate-Info/Documents/CHAPTER_VIII.pdf (last visited April 3, 2019)).

If accepted, the grievance is forwarded to the appropriate official who then issues a First Step Response to the complaining inmate. *Howard, supra*. If the inmate is unsatisfied with the first response, he may continue to the Second Step by completing an appropriate ARP form and sending it to the Legal Claims Adjudicator. *Id*. The Superintendent, Warden or Community Corrections Director will then issue a final ruling, or Second Step Response – which completes the ARP process. *Id*. Issuance of the Second Step Response is the only way to complete the grievance process. If the inmate is unsatisfied with that response, he may file suit in state or federal court. *Id*.

In his complaint, Eric Jones alleges that Warden Morris moved him to Unit 29-A building to a cell without power, lights, or running water in retaliation for pursuing his legal remedies. Doc. [1] at 11. Mr. Jones alleges that the conditions of his cell are so poor that they violate his constitutional rights – and that his move there was part of an effort to retaliate against him by Defendant Morris. These allegations, are not, however, included in any of the grievances he attached to his complaint or on file with MDOC. *See* Doc. [1] and Exhibit "A", *generally*. Mr. Jones failed to present these claims to the grievance process – and thus failed to exhaust his available administrative remedies, as required by the PLRA. Further, though Mr. Jones filed several grievances concerning medical treatment, he did not pursue his grievance concerning asthma treatment to the second step of the process. Exhibit "A" at 000001. In addition, none of his grievances, including ARP MSP-18-1494 (which he did take through both steps of the process), refer to Warden Morris by name or description. For these reasons,

- 8 -

Mr. Jones' claims regarding retaliation and poor general conditions of confinement must be dismissed for failure to exhaust administrative remedies.

## Denial of Medical Treatment

In order to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 260 (1976); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The test for establishing deliberate indifference is one of "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under this standard, a state actor may not be held liable under 42 U.S.C. § 1983 unless plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838.

Only in exceptional circumstances may a court infer knowledge of substantial risk of serious harm by its obviousness. *Id.* Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986), *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986). In cases such as this, arising from delayed medical attention rather than a clear denial of medical attention, a plaintiff must demonstrate that he suffered substantial harm resulting from the delay in order to state a claim for a civil rights violation. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993); *Campbell v. McMillin*, 83 F. Supp. 2d 761 (S. D. Miss. 2000). A prisoner's mere disagreement with medical treatment provided by prison officials does not

state a claim against the prison for violation of the Eighth Amendment by deliberate indifference to his serious medical needs. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir. 2001), *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

"Deliberate indifference is not established when medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). Nor is it established by a physician not accommodating a prisoner's requests in a manner he desired or the prisoner's disagreement with the treatment. *Id.*; *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007). To meet his burden in establishing deliberate indifference on the part of medical staff, the plaintiff "must show that [medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brauner*, 793 F.3d at 498.

**Mr. Jones' Treatment:**

Despite Mr. Jones' claims, medical staff regularly saw him, providing diagnostic treatment and monitoring his condition. He submitted a sick call request on September 20th, 2018 complaining of cold sweats and vomiting. Ex. "B" at 000941-000942. This is the same complaint made in ARP 18-1494. Doc. [1] at 12-14. Mr. Jones' institutional medical record shows that he was then scheduled for an appointment on September 21, 2018, which was rescheduled several times and ultimately canceled due to staffing issues. Exhibit "B" at MDOC 000939-000940. However, on September 27, 2018, a week after his sick call request, Mr. Jones was seen for a sick call request received on September 20th, 2018. *Id.* at 000942. At that appointment, Mr. Jones complained of cold sweats and weight loss, but having a good appetite. *Id.* Medical staff then ordered a series of laboratory tests to attempt to identify the problem. *Id.* at 000943. These included tests for his Hemoglobin A1c and glucose levels,

thyroid hormone levels, and a comprehensive metabolic panel. *Id.* at 000945-000949. On October 16, 2018, medical staff saw Mr. Jones again concerning the results of his lab tests, weight loss, and kidney pain. *Id.* at 000950. The results showed a slight hemoglobin deficiency, but was otherwise normal. *Id.* at 000950 and 0001743-001474.

In response to many sick call requests during the relevant period, MDOC medical personnel took Jones' vitals. His medical records show that MDOC medical personnel took his vital signs on sixteen occasions between November 2017 and August 2019. *See* Ex. "B" at 000836, 000852, 000862, 000864, 000872, 000875, 000905, 000910, 000936-000937, 000949-942, 000957, 000964, 001010, 001013, 001017, 001034. These vital signs included his weight, oxygenation saturation levels and respiration – critical measurements that can identify illnesses affecting the lungs. *See Id*. Mr. Jones contends that monitoring is insufficient to diagnose what he considers to be a severe mystery ailment. His medical records show regular monitoring by MDOC staff, but are devoid of any sign that he is suffering from an undiagnosed illness.

Indeed, in August 2019, one month before filing his complaint, Jones had a slightly elevated 124/86 blood pressure, pulse of 76, 98.4-degree temperature, a normal heart rate, a respiration rate of eighteen breaths per minute, and a 98 percent oxygen saturation rate at room temperature. *Id*. at 1034. With the exception of those taken during a January 2018 episode (during which he was treated and monitored overnight for asthma), Mr. Jones' vitals were similar throughout the relevant period, though his blood pressure has improved over time.

Mr. Jones points to what he characterizes as sudden and rapid weight loss in 2018 as evidence that MDOC officials should recognize that he is ill. Indeed, he did lose quite a bit of weight in 2018 – approximately 23 pounds over eight months (from 175 pounds in February to 152 pounds in October). Ex. "B" at 000910 and 000949 to 000951. An approximately three-pound-per-month weight loss is

not so extreme as to indicate to a physician a patient is seriously ill. In August 2019, one month before filing his complaint, Mr. Jones weighed 152 pounds. *Id.* at 1034. At that weight, Mr. Jones' Body Mass Index was 20.69, which does not qualify as "underweight."[3] *Id.*

Jones also claims prison officials denied him access to an asthma pump and chronic care and well as treatment for other unspecified lung-related ailments. He failed to mention in his complaint that he also suffers from COPD (Chronic Obstructive Pulmonary Disease). *Id.* at 000938. For his asthma, Jones had been prescribed a Xoponex inhaler since 2015. *Id.* at 000058. In January of 2018, Jones submitted a sick call stating that his inhaler was not working anymore, and, because his symptoms suggested a possible asthmatic episode, he underwent treatment regarding difficulty breathing. *Id.* at 000851. Mr. Jones complained of fluid in his lungs, coughing, and wheezing. MDOC officials took his vitals and discovered that his oxygen levels had dropped to 88. *Id.* at 000872. He was given oxygen and kept under overnight observation, until his oxygen saturation was 98% with non-labored breathing. *Id.* at 000888. A few days later, a nurse noted that he was "up and about" in his cell, with no respiratory distress noted. *Id.* at 000909.

Medical staff continued to treat Mr. Jones with Xoponex until September of 2018, when the medication was discontinued due to his non-compliance, and asthma was removed as a problem on his chart (which read afterwards that Jones had a history of asthma). *Id.* at 000938-000939. In November 2018, two months after he was taken off his inhaler, he submitted a sick call requests complaining of difficulty breathing and stated that his lungs felt as they did during his January

---

[3]A Body Mass Index (BMI) of 18.5 or lower is considered underweight.

https://www.cdc.gov/healthyweight/assessing/index.html#:~:text=If%20your%20BMI %20is%20less,falls%20within%20the%20obese%20range.

episode. Medical personnel examined him and determined that he had common cold symptoms and exhibited no distress. *Id.* at 000964-000965.

Mr. Jones' medical records show a pattern of regular treatment and medication for his asthma and other lung-related complaints. He was removed from his asthma pump, not out of deliberate indifference to his health, but because he no longer needed it and was not taking it – or not taking it properly.

Mr. Jones has also alleged that the defendant has deprived him of necessary STD testing. He requested STD testing in August of 2019, and MDOC records do not reflect that he received it. However, his stated basis for this request was that he had gotten a tattoo, and the nurse's notes reflect that he had a knowledge deficit regarding STDs. *Id.* at 001035. Mr. Jones did not present, nor does he allege, any symptoms of life-threatening or serious illness related to STDs. While he may not have gotten the medical care he requested, nothing in his records or contained in his complaint reflect that a sexually transmitted disease poses a serious risk to his health.

### No Evidence of Denial of Adequate Medical Care

In this case, Mr. Jones received ongoing medical care for his various complaints, including examinations and diagnostic testing. He, at most, alleges that he disagrees with the medical treatment he has received, and, as set forth above, his disagreement does not rise to the level of a constitutional claim. *Gibbs, supra*. These allegations must be dismissed for failure to state a claim upon which relief could be granted.

### No Evidence of Retaliation

Prison officials may not retaliate against prisoners for exercising their constitutional rights. *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006). On the other hand, courts must view such claims with skepticism to keep from getting bogged down in every adverse action prison officials take. *Id.*

The elements of a claim under a retaliation theory are the plaintiff's invocation of "a specific constitutional right," the defendant's intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, *i.e.*, "but for the retaliatory motive the complained of incident . . . would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995) (citations omitted ), *cert. denied*, 516 U.S. 1084, 116 S. Ct. 800, 133 L. Ed. 2d 747 (1996). A prisoner seeking to establish a retaliation claim must also show that the prison official's conduct was sufficiently adverse so that it would be capable of deterring a person of ordinary firmness from exercising his constitutional rights in the future. *Winding v. Grimes*, 4:08CV99-FKB, 2010 WL 706515 at 3 (S.D. Miss. Feb. 22, 2010); *citing Morris v. Powell*, 449 F.3d 682, 684–85 (5th Cir. 2006) at 685. A single incident involving a minor sanction is insufficient to prove retaliation. *Davis v. Kelly*, 2:10CV271-KS-MTP (citing *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999), 2:10CV271-KS-MTP, 2012 WL 3544865 *Id.*). Similarly, inconsequential (*de minimis*) acts by prison officials do not give rise to an actionable retaliation claim. *See Morris* at 685.

In this case, Eric Jones must prove that he engaged in constitutionally protected activity (seeking redress for grievances), faced significant adverse consequences, and that such action was taken "in an effort to chill [his] access to the courts or to punish [him] for having brought suit." *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1296 (5th Cir.), *cert. denied*, 513 U.S. 926, 115 S. Ct. 312, 130 L. Ed. 2d 275 (1994); *see also Serio v. Members of Louisiana State Board of Pardons*, 821 F.2d 1112, 1114 (5th Cir.1987). The showing in such cases must be more than the prisoner's "personal belief that he is the victim of retaliation." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995). *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).

The Fifth Circuit has made clear the dangers of permitting retaliation claims to proceed in the absence of factual allegations to support an inference of a retaliatory motive. In *Whittington v.*

*Lynaugh*, 842 F.2d 818, 819 (5th Cir. 1988), the plaintiff, Daniel Johnson, had filed numerous lawsuits against administrators and staff within the Texas prison system. The defendants then denied Johnson's request to have his custody status upgraded, and Johnson alleged that the denial was in retaliation for filing his previous suits. *Id.* The Fifth Circuit rejected Johnson's claim – and explained why courts must insist upon specific factual allegations to support an inference of retaliation:

> If we were to hold that [Johnson] by his allegations in this case had established a case which was entitled to the full panoply of discovery, appointment of counsel, jury trial and the like, we would be establishing a proposition that would play havoc with every penal system in the country. Prison administrators must classify and move prisoners. It is a virtual truism that any prisoner who is the subject of an administrative decision that he does not like feels that he is being discriminated against for one reason or another, such as the past filing of a grievance, a complaint about food or a cellmate, or a prior complaint that he was not being treated equally with other prisoners. If we were to uphold the further pursuit of [Johnson's] complaint in this case we would be opening the door to every disgruntled prisoner denied the next level of trustyship, reassigned to another prison job, moved to another cell, [or] claiming his shoes were uncomfortable, to bring such a suit.

*Whittington v. Lynaugh*, 842 F.2d 818, 819 (5th Cir. 1988).

Prisoners routinely file grievances against prison staff on an ongoing basis, for any number of reasons. As such, it is not uncommon for a prisoner to file a grievance, then receive a Rule Violation Report (or face some other adverse event) sometime thereafter. Thus, to avoid turning nearly adverse action against a prisoner into a claim of retaliation, courts insist upon additional allegations or evidence to substantiate a retaliation claim, such as prison staff issuing threats of disciplinary action if an inmate files further grievances, staff members pulling an inmate aside to threaten him, members of prison staff perpetrating unprovoked acts of violence against an inmate, or prison staff members wholly fabricating charges of prison rule violations

against an inmate. *See Decker v. McDonald*, 2010 WL 1424322 (E.D. Tex. 2010) (Magistrate Judge's Report and Recommendation) (unpublished), adopted by the District Court, 2010 WL 1424292 (E.D. Tex.) (unpublished).

Mr. Jones has simply offered no evidence to suggest that Warden Morris caused his transfer to another unit at Parchman. His complaint alleges only that in July of 2019, he was moved to Unit 29 building to a cell with no lights or working sink. Jones states that he "…believes this to be in retaliation for his legal efforts. Warden Morris made the move." *Id*. Doc. [1] at 11. Mr. Jones provides no evidence to support that Warden Morris was responsible for the transfer – or that the transfer was made in retaliation for exercising his legal rights. Jones' drill down report shows that he began his most recent stay at Parchman in Unit 29-A beginning in September of 2017. Ex. "C" at 000070. After a stay in the prison hospital, he was moved to 29-L from February 2018 to July 2019, when he was moved back to 29-A for the remainder of his stay at Parchman. *Id.* at 000070.

However, the drill down report also shows that the officer ordering the move to 29-A was Lakeisha Galloway, not Warden Morris. *Id*. The exhibits attached to the Complaint show grievances concerning these allegations dating from September of 2018, and Mr. Jones did not file the present action until September of 2019. *See* Doc [1]. He was moved back to 29-A almost a year after he began filing grievances – and two months before he filed the instant suit. He has alleged no facts to support his claim that the move was directed by Warden Morris or motivated by retaliation; nor has he provided a timeline showing causation between his exercise of a constitutional right and the move to 29-A. Indeed, Mr. Jones provides nothing more than his bare allegation that he is the victim of retaliation; he has offered no facts to show that the move was anything more than a routine administrative action. For these reasons, judgment will be entered in favor of the defendant regarding Mr. Jones' claim of retaliation.

*Supervisor Liability*

Eric Jones' claim against defendant Warden Morris also fails because Jones has not established liability against Morris as a supervisor. A plaintiff proceeding under 42 U.S.C. § 1983 cannot establish that a government official violated the plaintiff's constitutional rights simply by virtue of the official's role as a supervisor. *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). For a plaintiff to state a valid claim under § 1983, he must "identify defendants who are either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995) (citing *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983)). A § 1983 plaintiff cannot proceed against a prison official based solely on the official's participation in the prison grievance process. *Dehghani v. Vogelgesang*, 226 Fed.Appx. 404, 406 (5th Cir. 2007). There are only two scenarios in which a supervisor may be held liable under § 1983: (1) when he affirmatively participates in the incident, and (2) when he implements an unconstitutional policy that results in constitutional injury. *Wernecke v. Garcia*, 591 F.3d 386, 401 (5th Cir. 2009). Indeed, a federal court cannot hold a supervisor liable for failure to supervise his subordinates – even when he is present on the scene – because, after *Ashcroft v. Iqbal*, 556 U.S. 662, 662, 129 S. Ct. 1937, 1939, 173 L. Ed. 2d 868 (2009), "a government official can be held liable only for his own misconduct." *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).

Though failure to train employees may rise to the level of an official government policy – giving rise to a claim under 42 U.S.C. § 1983, such claims are a rarity:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See *Oklahoma City v. Tuttle,* 471 U.S. 808, 822–823, 105 S.Ct. 2427, 85 L.Ed.2d 791

> (1985) (plurality opinion) ("'[A] 'policy' of 'inadequate training' '" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* "). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton,* 489 U.S., at 388, 109 S.Ct. 1197. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.,* at 389, 109 S.Ct. 1197.

*Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359–60, 179 L. Ed. 2d 417 (2011).

In this case, Mr. Jones has not alleged that Morris was personally directing his care; nor has he alleged that Morris failed to train his subordinates or implemented an unconstitutional policy, which caused Mr. Jones injury. As such, defendant Morris is entitled to summary judgment on this issue.

### Conclusion

For the reasons set forth above, the defendants' motion for summary judgment will be granted, judgment will be entered in favor of the defendants in all respects. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 6th day of May, 2021.

/s/ David A. Sanders
DAVID A. SANDERS
UNITED STATES MAGISTRATE JUDGE